IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| RISE FOR ANIMALS, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Case No. 8:22-cv-00810-JRR |
| TOM VILSACK, Secretary of the United | * | |
| States Department of Agriculture, *et al.,* | * | |
| Defendants. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## <u>MEMORANDUM OPINION</u>

## I.   <u>INTRODUCTION</u>

Plaintiffs Rise for Animals ("Rise") and Animal Legal Defense Fund ("ALDF") are nonprofit organizations focused on advancing the interests of animals. (ECF No. 1 ¶¶ 6, 12.) Specifically, Rise seeks to end the suffering of nonhuman primates used in research, and works to educate the public, lawmakers, and others to that end. *Id.* ¶ 6. Similarly, ALDF engages in campaigns to bring public awareness to what it views as the failures of laboratories to provide proper care for their research subject primates. *Id.* ¶ 12.

Rise and ALDF bring this action pursuant to the Administrative Procedure Act ("APA") against Defendants Tom Vilsack, Secretary of the United States Department of Agriculture ("USDA"), and Elizabeth Goldentyer, Acting Deputy Administrator for Animal Care at the Animal Plant and Health Inspection Service ("APHIS").[1] Plaintiffs seek judicial review of the Agency's policy ("Partial Inspection Policy")[2] under which, in Plaintiffs' view, the Agency "relies

---

[1] The USDA is the parent agency of APHIS. The USDA and APHIS are together referred to herein as the "Agency."
[2] Throughout the Complaint and the parties' motions papers, reference is made to the "Partial Inspection Policy," the "Policy," the "unlawful Policy," the "Inspection Policy," and the "Focused Inspection" seemingly interchangeably.

on third-party accreditation by the Association of the Assessment and Accreditation of Laboratory Animal Care ("AAALAC"), a private trade association, to evade its statutory obligation to conduct full annual inspections of research facilitates as required under the Animal Welfare Act ("AWA"), 7 U.S.C. § 2146."  (ECF No. 1 at 1.) [3]

Pending before the court are Plaintiffs' Motion for Summary Judgment and memorandum of law in support thereof (ECF Nos. 25 and 25-1) and Defendants' Motion to Dismiss and Cross-Motion for Summary Judgment and memorandum of law in support thereof.  (ECF Nos. 35 and 35-1.)  The court has reviewed the parties' submissions and no hearing is necessary.  Local Rule 105.6 (D. Md. 2023).

## II.   BACKGROUND

### A.   Statutory and Regulatory Background

#### 1.   Animal Welfare Act of 1966

In 1966, Congress enacted the AWA to "[e]nsure that animals intended for use in research facilities . . . are provided humane care and treatment."   7 U.S.C. § 2131(1).   The AWA "authorizes the Secretary of Agriculture to promulgate standards and other requirements governing the humane handling, housing, care, treatment, and transportation of certain animals by

---

The policy at issue in this case, titled "Annual Inspections for Research Facilities," and marked "For Internal Use Only," states:

> In response to concerns from inspectors about workload, to promote the consistency of our inspections for all research facilities, and to allow us to focus our inspection resources on facilities that present greater risks to animal welfare, in February 2019, we issued guidance that made it mandatory (rather than discretionary) for inspectors to perform focused inspection at AAALAC-accredited research facilities unless the research facility requested a full inspection. This focused inspection counts as the facility's annual inspection.

(AR03728, "Partial Inspection Policy.")   To avoid confusion, the court will refer to the policy at issue in this case as the Partial Inspection Policy.

[3] Throughout this memorandum opinion, citation to document page numbers refer to the page number within the original source, not pagination assigned by the ECF system.

dealers, exhibitors, and other regulated entities."  64 Fed. Reg. 38145 (July 15, 1999).  The Secretary of Agriculture delegated responsibility to APHIS to enforce the AWA.  *Id.*

### 2.    AWA Amendment

In 1985, Congress recognized that nonhuman primates have psychological and social needs that are critical to their well-being and acknowledged that the "[c]urrent standards leave too much room for shoddy care and inhumane treatment."  131 Cong. Rec. 22257 (Aug. 1, 1985) (statement of Sen. Chafee.  Further, Congress explained stricter standards were required to protect animals involved in research and experiments.  131 Cong. Rec. 22257 (Aug. 1, 1985).

Subsequently, in 1985, Congress passed the Improved Standards for Laboratory Animals Act ("ISLAA"), amending AWA.  Pub. L. No. 99-198, 99 Stat. 1645 (1985).  ISLAA amended AWA to "ensure that animals necessary for research receive fair and humane treatment, and that their discomfort is kept to an absolute minimum," while also recognizing that "animal research is essential to the progress of efforts to protect human health."  131 Cong. Rec. 29274 (Aug. 1, 1985) (statement of Sen. Moynihan).  ISLAA requires the Secretary of the USDA to promulgate standards that "include minimum requirements . . . for a physical environment adequate to promote the psychological well-being of primates."  7 U.S.C. § 2143(a)(2)(B).  ISLAA further provides: "[t]he Secretary shall require each research facility to show upon inspection, and to report at least annually, that the provisions of this Act [7 U.S.C. § 2131, *et seq.*] are being followed and that professionally acceptable standards governing the care, treatment, and use of animals are being followed by the research facility during actual research or experimentation."  *Id.* § 2143(a)(7)(A).  In complying with the standards set forth in § 2143(a)(7)(A), "research facilities shall provide . . . (i) information on procedures likely to produce pain or distress in any animal and assurances demonstrating that the principal investigator considered alternatives to those

procedures; (ii) assurances satisfactory to the Secretary that such facility is adhering to the standards described in this section; and (iii) an explanation for any deviation from the standards promulgated under this section." *Id.* § 2143(a)(7)(B).

With respect to investigations and inspections involving research facilities, "[t]he Secretary shall make such investigations or inspections as he deems necessary to determine whether any dealer, exhibitor, intermediate handler, carrier, research facility, or operator of an auction sale subject to section 2142 of this title, has violated or is violating any provision of this chapter or any regulation or standard issued thereunder . . . ." 7 U.S.C. § 2146(a).  Further, "[t]he Secretary shall inspect each research facility at least once each year and, in the case of deficiencies or deviations from the standards promulgated under this Act, shall conduct such follow-up inspections as may be necessary until all deficiencies or deviations from such standards are corrected." *Id.*  Finally, AWA requires that APHIS "make publicly available via searchable database . . . all final [AWA] inspection reports, including all reports documenting all [AWA] violations and non-compliances observed by USDA officials and all animal inventories for the current year and the preceding three years . . . ." 7 U.S.C. § 2146a(b).

### 3.    USDA Regulation

In 1991, the USDA promulgated a regulation to implement ISLAA, which provides in relevant part:

> Dealers, exhibitors, and research facilities must develop, document, and follow an appropriate plan for environment enhancement adequate to promote the psychological well-being of nonhuman primates. The plan must be in accordance with the currently accepted professional standards as cited in appropriate professional journals or reference guides, and as directed by the attending veterinarian. This plan must be made available to APHIS [Animal and Plant Health Inspection Service] upon request, and, in the case of research facilities, to officials of any pertinent funding agency.

56 Fed. Reg. 6426 (1991), codified at 9 C.F.R. § 3.81.  The regulation further requires that each plan address the following topics: (1) "the social needs of nonhuman primates of species known to exist in social groups in nature;" (2) "[e]nvironmental enrichment, [such that] [t]he physical environment in the primary enclosures must be enriched by providing means of expressing noninjurious species-typical activities;" (3) special conditions for certain types of primates, including infants and young nonhuman primates; and (4) the use of restraint devices.  *Id.* §§ 3.81(a)-(d).

### B.    <u>Procedural Background</u>

On April 5, 2022, Plaintiffs filed the instant action seeking judicial review of the Partial Inspection Policy, pursuant to 5 U.S.C. § 706(2)(A).[4]  (ECF No. 1.)  Plaintiffs request that the court: (1) declare the Partial Inspection Policy unlawful; (2) set aside the Partial Inspection Policy; (3) award them their reasonable attorneys' fees and costs; and (4) award any other relief the court deems just and proper.  (ECF No. 1 at 19.)

On April 14, 2023, Plaintiffs filed the Motion for Summary Judgment at ECF No. 25; and on July 31, 2023, Defendants filed the Motion to Dismiss and Cross-Motion for Summary Judgment at ECF No. 35.   Plaintiffs argue that the Partial Inspection Policy violates the plain language of the AWA, the Partial Inspection Policy is an impermissible delegation of the Agency's obligation to conduct annual inspections, and in adopting the Partial Inspection Policy, the Agency acted arbitrarily and capriciously, and abused its discretion within the meaning of the APA, 5 U.S.C. §706(2)(A).  (ECF No. 25-1 at 11.)  Defendants counter that this court lacks subject matter

---

[4] 5 U.S.C. § 706(2)(A) provides in part: "To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"

jurisdiction over the instant action because: (1) Plaintiffs lack standing; (2) the manner in which the Agency conducts inspections is committed to agency discretion; and (3) the Partial Inspection Policy does not constitute agency final action.  (ECF No. 35-1 at  6-18.)  Additionally, Defendants argue they are entitled to judgment as a matter of law because: (1) the Agency complies with the AWA requirements; (2) the Partial Inspection Policy does not delegate authority to any entity; and (3) the Partial Inspection Policy is distinct from the prior Agency policy that Plaintiffs contend is arbitrary and capricious.  *Id.* at 1-2.

## III.   LEGAL STANDARDS

### Federal Rule of Civil Procedure 12(b)(1)

As set forth immediately above, Defendants move to dismiss this case pursuant to Rule 12(b)(1) arguing that the court lacks subject matter jurisdiction over Plaintiffs' APA claim because the way in which the Agency conducts inspections is committed to its discretion, there is no final agency action, and Plaintiffs lack standing.  (ECF No. 35-1 at 6-18.)

#### "Committed to agency discretion by law" and No Final Action

"Although there is a 'strong presumption' in favor of judicial review of agency action," *Speed Mining, Inc. v. Fed. Mine Safety & Health Review Comm'n*, 528 F.3d 310, 316 (4th Cir. 2008) (quoting *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986)), the APA bars judicial review of agency action 'committed to agency discretion by law.'"  *Casa De Maryland v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 697 (4th Cir. 2019) (quoting 5 U.S.C. § 701(a)(2)).[5]   Additionally, "[t]o determine whether an agency's action receives judicial review

---

[5] There is a circuit split regarding whether a complaint seeking review of an agency action "committed to agency discretion by law" (per 5 U.S.C. § 701(a)(2)) affects a court's subject matter jurisdiction.  In *Holbrook v. Tennessee Valley Authority*, the Western District of Virginia explained:

The D.C. Circuit has concluded that "a complaint seeking review of agency action 'committed to agency discretion by law,' 5 U.S.C. § 701(a)(2), has failed to state a claim under the APA, and therefore should be dismissed under Rule 12(b)(6),

under the APA's general review provisions, the contested action must qualify as final agency action." *Doe v. Tenebaum*, 127 F. Supp. 3d 426, 439 (D. Md. 2012) (citing *Flue–Cured Tobacco Coop. Stabilization Corp. v. U.S. EPA*, 313 F.3d 852, 857 (4th Cir. 2002)). "In other words, courts lack subject matter jurisdiction to resolve claims that plaintiffs assert under the APA's general review provisions where the agency action on which they base such claims lacks finality." *Id.*

Subject matter jurisdiction challenges may proceed in two ways: a facial challenge or a factual challenge. *Mayor & City Council of Balt. v. Trump*, 416 F. Supp. 3d 452, 479 (D. Md. 2019). A facial challenge asserts "that the allegations pleaded in the complaint are insufficient to establish subject matter jurisdiction." *Id.* A factual challenge asserts "that the jurisdictional allegations of the complaint [are] not true." *Id.* (quoting *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009)). "In a facial challenge, 'the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction.'" *Trump*, 416 F. Supp. 3d at 479 (quoting *Kerns*, 585 F.3d at 192 (instructing that in a facial challenge to subject matter jurisdiction the plaintiff enjoys "the same procedural protection

---

not under the jurisdictional provision of Rule 12(b)(1)." *Sierra Club v. Jackson*, 648 F.3d 848, 854 (D.C. Cir. 2011). The Sixth Circuit considered the issue and reached the opposite conclusion in an unpublished opinion, finding, "In classes of cases where we have no meaningful standard by which to evaluate the agencies' exercise of discretion, we have no jurisdiction." *Sheldon v. Vilsack*, 538 F. App'x 644, 649 n.4 (6th Cir. 2013) (unpublished). Most courts of appeals considering such challenges have addressed them as jurisdictional issues. *See, e.g., Gentile v. Secs. & Exch. Comm'n*, 974 F.3d 311, 320 (3d Cir. 2020); *Vela-Estrada v. Lynch*, 817 F.3d 69, 71–72 (2d Cir. 2016); *Animal Legal Def. Fund v. U.S. Dept. of Agric.*, 789 F.3d 1206, 1214 (11th Cir. 2015) ("Whether an agency action is reviewable under § 701(a)(2) is a matter of subject matter jurisdiction."); *Gulf Restoration Network v. McCarthy*, 783 F.3d 227, 237–28 (5th Cir. 2015).

527 F. Supp. 3d 853, 856 n.1 (W.D. Va. 2021), *aff'd*, 48 F.4th 282 (4th Cir. 2022). The *Holbrook* court agreed with the Sixth Circuit in *Sheldon* and dismissed the plaintiff's claims for lack of subject matter jurisdiction. *Id.* at 858; *but see Nat'l Fed'n of the Blind v. U.S. Abilityone Comm'n*, 421 F. Supp. 3d 102, 118 n.4 (D. Md. 2019) (relying on *Sierra Club* and analyzing whether an agency's action is committed to agency discretion by law under Rule 12(b)(6) not Rule 12(b)(1)). The court agrees with *Holbrook* and will address Defendants' argument that the Agency's action is committed to agency discretion under Rule 12(b)(1).

as . . . under a Rule 12(b)(6) consideration.")).  "[I]n a factual challenge, 'the district court is entitled to decide disputed issues of fact with respect to subject matter jurisdiction.'"  *Id.*

### Lack of Standing

Rule 12(b)(1) also "governs motions to dismiss for mootness and for lack of standing, which pertain to subject matter jurisdiction." *Stone v. Trump*, 400 F. Supp. 3d 317, 333 (D. Md. 2019).  The party invoking federal jurisdiction bears the burden of establishing standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561.  "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Id.* (citation omitted).  "In response to a summary judgment motion, however, the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *Id.* (citation omitted).

### Federal Rule of Civil Procedure 56

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  "In a case involving review of a final agency action under the APA, however, the standard set forth in Rule 56(a) does not apply because of the limited role of a court in reviewing the administrative record." *Ctr. for Sci. in the Pub. Interest v. Perdue*, 438 F. Supp. 3d 546, 556 (D. Md. 2020).  "Under the APA, it

is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas 'the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.C. Cir. 2006) (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769-70 (9th Cir. 1985)). "Summary judgment thus serves as a mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Id.*

*Maine v. Norton* explains well the court's administrative judicial review role on motions for summary judgment:

> A Statement of Material Facts "as to which the moving party contends there is no genuine issue of material fact to be tried" serves limited purpose in cases brought pursuant to the APA because, as a general rule, all relevant facts are contained in the administrative record for such a case, and, as a result, there are no material facts in dispute. Under section 706 of the APA, the Court's role is to determine whether the administrative agency was "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law" in making the findings challenged by Plaintiffs. 5 U.S.C. § 706(2)(A). Because this case involves a challenge to a final administrative action, the Court's review is limited to the administrative record. *See* 5 U.S.C. § 706; *Camp v. Pitts*, 411 U.S. 138, 142, 93 S. Ct. 1241, 1244, 36 L. Ed. 2d 106 (1973). Summary judgment is an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based upon the administrative record, even though the court does not employ the standard of review set forth in Rule 56. *See, e.g., Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44, 105 S. Ct. 1598, 1607, 84 L. Ed. 2d 643 (1985); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S. Ct. 814, 28 L. Ed. 2d 136 (1971); *Richards v. I.N.S.*, 180 U.S. App. D.C. 314, 554 F.2d 1173, 1177 n.28 (D.C. Cir. 1977).

*Maine v. Norton*, 257 F. Supp. 2d 357, 363 (D. Me. 2003).

"It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" *Dep't of Homeland*

*Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) (quoting *Michigan v. EPA*, 576

U.S. 743, 758 (2015)).   The APA instructs the reviewing court to "hold unlawful and set aside

agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion,

or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

    As the United States Supreme Court explained in *Motor Vehicle Mfrs. Ass'n. of U.S., Inc.*

v. *State Farm Mutual Auto. Ins. Co.*:

> The scope of review under the "arbitrary and capricious" standard is
> narrow and a court is not to substitute its judgment for that of the
> agency. Nevertheless, the agency must examine the relevant data
> and articulate a satisfactory explanation for its action including a
> "rational connection between the facts found and the choice
> made." *Burlington Truck Lines v. United States,* 371 U.S. 156, 168,
> 83 S. Ct. 239, 245–246, 9 L.Ed.2d 207 (1962). In reviewing that
> explanation, we must "consider whether the decision was based on
> a consideration of the relevant factors and whether there has been a
> clear error of judgment." *Bowman Transp. Inc. v. Arkansas-Best
> Freight System, supra,* 419 U.S., at 285, 95 S. Ct., at 442; *Citizens
> to Preserve Overton Park v. Volpe, supra,* 401 U.S., at 416, 91 S.
> Ct., at 823. Normally, an agency rule would be arbitrary and
> capricious if the agency has relied on factors which Congress has
> not intended it to consider, entirely failed to consider an important
> aspect of the problem, offered an explanation for its decision that
> runs counter to the evidence before the agency, or is so implausible
> that it could not be ascribed to a difference in view or the product of
> agency expertise. The reviewing court should not attempt itself to
> make up for such deficiencies: "We may not supply a reasoned basis
> for the agency's action that the agency itself has not given." *SEC v.
> Chenery Corp.,* 332 U.S. 194, 196, 67 S. Ct. 1575, 1577, 91 L.Ed.
> 1995 (1947). We will, however, "uphold a decision of less than ideal
> clarity if the agency's path may reasonably be discerned." *Bowman
> Transp. Inc. v. Arkansas-Best Freight System, supra,* 419 U.S., at
> 286, 95 S. Ct., at 442.

*Motor Vehicle Mfrs. Ass'n. of U.S., Inc. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43

(1983); *see also Roe v. Dep't of Defense,* 947 F.3d 207, 220 (4th Cir. 2020) (same and explaining

that "[a]lthough we accord substantial deference to an agency's final action and presume it valid,

'the arbitrary-and-capricious standard does not reduce judicial review to a rubber stamp of agency action.'") (citations omitted).

IV.   **ANALYSIS**

1.   **Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction**

Defendants argue that this court lacks jurisdiction over the instant action for three reasons: (1) the way in which the Agency conducts inspections is committed to agency discretion; (2) the Partial Inspection Policy is not a final agency action; and (3) Plaintiffs lack standing.  (ECF No. 35-1 at 6-18.)  The court addresses these arguments in reverse of the order in which Defendants present them in their papers.

A.   **Standing**

Standing consists of three elements: "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  A plaintiff bears the burden of establishing these three elements.  *Id.*  Additionally, "the Supreme Court has made it clear that the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement."  *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014) (internal quotation marks omitted).  An organization, like Rise or ADLF, "can assert standing based on two distinct theories."  *People for Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of W. Maryland, Inc. ("PETA")*, 843 F. App'x 493, 495 (4th Cir. 2021).  "It can assert standing in its own right to seek judicial relief for injury to itself and as a representative of its members who have been harmed."  *Id.* (citing *S. Walk at Broadlands Homeowner's Ass'n, Inc.*

11

*v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 182 (4th Cir. 2013)).  Here, Plaintiffs seek to redress their own alleged injury – often referred to as organizational standing.[6]  *Id.*

"In determining whether organizational standing exists, 'a court conducts the same inquiry as in the case of an individual.'"  *PETA*, 843 F. App'x at 495 (quoting *Md. Highways Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246, 1250 (4th Cir. 1991)).  As to the first element, "[t]o establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560).

Plaintiffs argue that they have suffered an informational injury stemming "from the denial of information that is required to be disclosed under the statute," 7 U.S.C. § 2146a(b).  (ECF No. 25-1 at 26.)  Plaintiffs also argue that they have suffered an organizational injury because the Partial Inspection Policy "impairs their ability to carry out their missions, with a subsequent drain on the organizations' resources."  *Id.*  In response, Defendants argue that Plaintiffs fail to identify a legal right to the information in question and, therefore, have suffered no injury at all – whether informational or organizational.  (ECF No. 35-1 at 13-17.)

"An 'informational injury' is a type of intangible injury that can constitute an Article III injury in fact."  *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 345 (4th Cir. 2017) (quoting *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 24 (1998)).  "However, a statutory violation alone does not create a concrete informational injury sufficient to support standing."  *Id.*  "Rather, a

---

[6] The parties refer to "informational standing," "organizational standing," "informational injury," and "organizational injury" interchangeably.  For clarity, the court notes that "organizational standing is merely the label assigned to the capacity in which the organization contends it has been harmed; it is not a separate type of injury."  *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 380 (D.C. Cir. 2017) (Williams, J., concurring in part and concurring in the judgment).  Accordingly, here, Plaintiffs assert organizational standing and allege both informational injury (*i.e.*, denial or lack of information as a result of the Partial Inspection Policy) and organizational injury (*i.e.*, diversion of resources to obtain information elsewhere and submitting additional FOIA requests as a result of the Partial Inspection Policy).

constitutionally cognizable informational injury requires that a person lack access to information to which he is legally entitled and that the denial of that information creates a 'real' harm with an adverse effect." *Id.* (citing *Spokeo*, 136 S.Ct. at 1548). Stated differently, "a plaintiff suffers a concrete informational injury where he is denied access to information required to be disclosed by statute, and he 'suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure.'" *Id.* at 345-46 (quoting *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016)).

Additionally, "[w]hen an organization sues on its own behalf . . . it may establish an injury in fact by showing that defendants' actions caused 'concrete and demonstrable injury to the organization's activities,' with a 'consequent drain on the organization's resources.'" *People for the Ethical Treatment of Animals, Inc. v. Tabak*, 662 F. Supp. 3d 581, 589 (D. Md. 2023) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). However, "[a]n organization cannot meet the [injury in fact] requirement simply because it chose to divert resources to educate its members or challenge an unlawful action in litigation, as such efforts result 'not from any actions taken by the defendant, but rather from the organization's own budgetary choices.'" *Id.* (quoting *Lane v. Holder*, 703 F.3d 668, 675 (4th Cir. 2012) (internal quotations and alterations omitted)); *see also Lane*, 703 F.3d at 675 ("To determine that an organization that decides to spend its money on educating members, responding to member inquiries, or undertaking litigation in response to legislation suffers a cognizable injury would be to imply standing for organizations with merely 'abstract concern[s] with a subject that could be affected by an adjudication.'") (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976); and citing *Fair Empl. Council of Greater Wash., Inc. v. BMC Mktg.*, 28 F.3d 1268, 1277 (D.C. Cir. 1994); *Ass'n for Retarded Citizens of Dallas v. Dallas County Mental Health & Mental Retardation Ctr. Bd. of Trustees*, 19 F.3d 241,

244 (5th Cir. 1994) (noting that finding standing for an organization that redirects some of its resources to litigation and legal counseling in response to actions of another party would "impl[y] that any sincere plaintiff could bootstrap standing by expending its resources in response to actions of another")).

The precise issue is whether the information Plaintiffs seek "must be publicly disclosed pursuant to a statute."[7] *See Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998) (explaining that a plaintiff "suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute") (citing *Pub. Citizen v. Dep't of Justice*, 491 U.S. 440, 449 (1989) (holding that failure to obtain information subject to disclosure under Federal Advisory Committee Act "constitutes a sufficiently distinct injury to provide standing to sue"); and *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373-74 (1982) (holding deprivation of information about housing availability constitutes "specific injury" for purposes of standing)).   Relying on *Salt Institute v. Leavitt*, Defendants argue that Plaintiffs have access to all the information to which they are entitled, and the Agency is not required to provide any further information under 7 U.S.C. § 2146a.  (ECF No. 35-1 at 13-14; citing *Salt*, 440 F.3d 156 (4th Cir. 2006)).  In response, Plaintiffs contend that, absent the Partial Inspection Policy, the Agency "would necessarily be collecting more information that would have to be reported to the public about whether research facilities are

---

[7] The court need not engage in a separate analysis for informational and organizational injuries, "[w]here an organization's only asserted injury is an informational one[.]"  *See Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 380 (D.C. Cir. 2017) ("If an organization's only claimed injury is informational, additional discussion of the same facts under the 'organizational' rubric will not clarify the court's reasoning."); *see Marino v. Nat'l Oceanic & Atmospheric Admin.*, 451 F. Supp. 3d 55, 62 (D.D.C. 2020), *aff'd*, 33 F.4th 593 (D.C. Cir. 2022) (noting that harms to the plaintiffs' ability to pursue their research interests and career goals and harms to the organization's ability to educate the public and policymakers "are mere second-order consequences of [the organization's] inability to access the reports . . . . The injuries alleged in the complaint are thus unavoidably informational in nature, and the plaintiffs cannot establish standing without meeting the requirements for informational injury").

complying with all applicable AWA standards—precisely the kind of injury the Supreme Court upheld in [*Fed. Election Comm'n v. Akins*]." (ECF No. 39 at 5.)

*Salt Institute v. Leavitt* is instructive. 440 F.3d 156 (4th Cir. 2006). There, the Fourth Circuit reviewed the district court's dismissal of the plaintiffs' suit for lack of subject matter jurisdiction. *Id.* at 157. Specifically, the court analyzed whether the plaintiffs suffered an injury in fact where they claimed that the Information Quality Act ("IQA") granted them a legal right to accurate information. *Id.* at 157-58. In reviewing the IQA and concluding that the plaintiffs lacked Article III standing, the court explained:

> By its terms, this statute creates no legal rights in any third parties. Instead, it orders the Office of Management and Budget to draft guidelines concerning information quality and specifies what those guidelines should contain. Because the statute upon which appellants rely does not create a legal right to access to information or to correctness, appellants have not alleged an invasion of a legal right and, thus, have failed to establish an injury in fact sufficient to satisfy Article III.
>
> Against this conclusion, appellants argue that the Supreme Court recognized the sufficiency of informational injuries in *Federal Election Commission v. Akins*, 524 U.S. 11, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998). However, in relying upon *Akins*, appellants confuse two distinct standing inquiries: the concreteness of the alleged injury and the status of the claimed right. In *Akins*, the Supreme Court held that an informational injury was "sufficiently concrete and specific" to satisfy Article III. *Id.* at 25, 118 S.Ct. 1777. In this case, we have not decided (and need not decide) the question whether appellants' alleged injury is sufficiently concrete and specific. Rather, we have decided the antecedent question whether Congress has granted a legal right to the information in question. *Akins* controls the former question, but not the latter. Indeed, on the latter question, *Akins* is distinguishable because the statute in question there, the Federal Election Campaign Act of 1971, clearly created a right to information by requiring the Federal Election Commission to make certain information available to the public. *See* 2 U.S.C. § 434(a)(11)(B) ("The Commission shall make a designation, statement, report, or notification that is filed with the Commission under this Act available for inspection by the public.").

> The IQA, by contrast, does not create any legal right to information or its correctness.

*Id.* at 159.  Accordingly, the court concluded that the statute in question "did not create any legal to information or its correctness" and, therefore, the plaintiffs failed to establish an injury in fact. *Id.*  Thus, the Fourth Circuit affirmed the district court's dismissal of the case for lack of subject matter jurisdiction.  *Id.* at 159-60.

Like the *Salt* plaintiffs, Plaintiffs here rely on *Akins* to argue they suffered an informational injury because, in their view, absent the Partial Inspection Policy, the Agency "would necessarily be collecting more information that would have to be reported to the public" pursuant to 7 U.S.C. § 2146a.  (ECF No. 25-1 at 27; ECF No. 39 at 5.)  In *Akins*, a group of voters challenged the decision of the Federal Election Commission ("FEC") that the American Israel Public Affairs Committee ("AIPAC") was not a "political committee" as defined by the Federal Election Campaign Act of 1971 ("FECA") and thus not subject to FECA's disclosure requirements.  524 U.S. at 13, 18.  In analyzing the plaintiffs' standing, the Supreme Court noted that the plaintiffs suffered an injury in fact—"their inability to obtain information . . . that, on [the plaintiffs'] view of the law, the statute requires that AIPAC make public."  *Id.* at 21.  As the *Salt* court noted, the statute at issue in *Akins* "clearly created a right to information by requiring the Federal Election Commission to make certain information available to the public."  *See Salt, supra.*

In *Akins*, the Supreme Court explained:

> In particular, the Act imposes extensive recordkeeping and disclosure requirements upon groups that fall within the Act's definition of a "political committee." Those groups must register with the FEC, appoint a treasurer, keep names and addresses of contributors, track the amount and purpose of disbursements, and file complex FEC reports that include lists of donors giving in excess of $200 per year (often, these donors may be the group's members), contributions, expenditures, and any other disbursements irrespective of their purposes. §§ 432–434.

16

*Fed. Election Comm'n v. Akins*, 524 U.S. 11, 14-15 (1998).  There, the defendants challenged standing on the basis that the plaintiffs did not suffer an injury in fact because the lawsuit "involves only a generalized grievance" and "is shared in substantially equal measure by all or a large class of citizens."  *Id.* at 23 (citation omitted).  The Supreme Court rejected this argument and held that the informational injury at issue was "sufficiently concrete and specific."  *Id.* at 25.

As Defendants argue here, "Plaintiffs do not allege that the USDA has failed to make the listed items (*i.e.*, inspection reports, enforcement records, etc.) available to the public. Rather, Plaintiffs' theory of informational harm is that the [Partial Inspection Policy] results in these documents containing different or less information than they might otherwise."  (ECF No. 35-1 at 13.)  Plaintiffs argue that they would receive additional information under the statute if the Partial Inspection Policy were not in place, and that the court must accept their view.  The court disagrees that it is so bound.[8]  *See Lawyers' Comm. for 9/11 Inquiry, Inc. v. Wray*, 848 F. App'x 428, 430 (D.C. Cir. 2021) (holding that a plaintiff's "reading of a statute for informational standing purposes must at least be plausible"); *Marino v. Nat'l Oceanic & Atmospheric Admin.*, 451 F. Supp. 3d 55, 60 (D.D.C. 2020), *aff'd*, 33 F.4th 593 (D.C. Cir. 2022) (noting that "the plaintiff must point to some statutory entitlement to the information it seeks, because otherwise it has not identified the 'legally protected interest' that injury in fact requires") (citing *Lujan*, 504 U.S. at 560).  "Plaintiffs must be 'deprived of information' required to be disclosed under the Act."  *Architects & Engineers for 9/11 Truth v. Raimondo*, No. 1:21-CV-02365, 2022 WL 3042181, at *5 (D.D.C. Aug. 2, 2022), *aff'd*, No. 22-5267, 2023 WL 6439491 (D.C. Cir. Oct. 3, 2023) (quoting *Jewell*, 828 F.3d at 992)).

---

[8] The court is reminded here again of the words of the Fifth Circuit addressing expenditure of resources to establish standing.  Were the court obliged to accept blindly a plaintiff's theory in support of standing, this would "impl[y] that any sincere plaintiff could bootstrap standing" on theory alone.  *Ass'n for Retarded Citizens of Dallas v. Dallas County Mental Health & Mental Retardation Ctr. Bd. of Trustees*, 19 F.3d 241, 244 (5th Cir. 1994).  That is not the law.

Unlike *Salt*, the statute in question here does require Defendants to publish documents, including final inspection reports. 7 U.S.C. § 2146a (requiring that APHIS "make publicly available via searchable database . . . all final [AWA] inspection reports, including all reports documenting all [AWA] violations and non-compliances observed by USDA officials and all animal inventories for the current year and the preceding three years . . . ."). Unlike *Akins*, however, Plaintiffs' standing theory does not rest on Defendants' failure to make final inspection reports public as required under 7 U.S.C. § 2146a. Rather, Plaintiffs' theory of standing rests on the substantive content (or lack thereof) of the final inspection reports.

In *Akins*, the plaintiffs suffered from the inability to obtain specific information pertaining to a specific committee, which in their view (and the Supreme Court's), AIPAC was statutorily bound to disclose. 524 U.S. at 21. In contrast, Plaintiffs here complain in general terms that the final inspection reports are merely threadbare because of how the Agency runs the shop (the Partial Inspection Policy); but do not complain that Defendants have failed to make final inspection reports public. Plaintiffs do not identify a "clearly created [statutory] right to information" that Defendants have violated by failure to publish. And critically, the alleged injury must be "concrete and particularized" and not "conjectural or hypothetical." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 344 (2006); *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 379 (D.C. Cir. 2017) ("Speculation is ordinarily fatal to standing[.]"). Plaintiffs hypothesize that absent the Partial Inspection Policy, the final inspection reports would be more robust.[9] That may well be the case, but based on binding precedent, it's not enough to demonstrate an informational injury.

---

[9] Plaintiffs argue:

> Therefore, under any reasonable reading of the statute, the USDA must, at a minimum, complete a full annual inspection of each facility for the agency to

As Defendants note, Plaintiffs' organizational injury claims "are part and parcel of the alleged informational injury and thus fail with it." *Lawyers' Comm. for 9/11 Inquiry, Inc. v. Wray*, 848 F. App'x 428, 431 (D.C. Cir. 2021) (citation omitted). That is, Plaintiffs' theory of standing is based on harms stemming from the Agency's "failure to disclose the desired information." *Lawyers' Comm. for 9/11 Inquiry, Inc. v. Wray*, 424 F. Supp. 3d 26, 33 (D.D.C. 2020), *aff'd*, 848 F. App'x 428 (D.C. Cir. 2021).

Plaintiffs allege:

> For example, one of Rise's most important tools for its animal advocacy work is its "Animal Research Laboratory Overview" ("ARLO") database. Rise uses ARLO to collect and publicly disseminate information about animal research facilities, including the kinds of research being conducted by these facilities, and whether such research is being conducted in compliance with all applicable state and federal laws, including the AWA. Rise heavily relies on the information contained in USDA inspection reports to update the database and maximize its effectiveness.
>
> Rise also relies on APHIS inspection reports to determine how best to allocate its resources by focusing its educational and advocacy

---

ensure that all deviations and deficiencies have been both identified and corrected. Such inspections would necessarily generate inspection reports with more information than those produced under the AAALAC Inspection Policy, where inspectors only look at one limited aspect of the facility, or a sample, each year.

Thus, on Plaintiffs' theory of the merits, by failing to conduct inspections of all aspects of the facility, the USDA is not collecting information it would otherwise collect.

Information that would be generated by complete inspections, in turn, would necessarily become available to Plaintiffs.

Thus, under Plaintiffs' theory of the case, the USDA would necessarily be collecting more information that would have to be reported to the public about whether research facilities are complying with all applicable AWA standards—precisely the kind of injury the Supreme Court upheld in *Akins*.

Therefore, it is beyond legitimate dispute that full inspections would necessarily generate additional information that, under Section 2146a, the agency would be required to disclose to Plaintiffs. 7 U.S.C. § 2146a.

(ECF No. 39 at 3-6.)

efforts on those facilities with the worst track records of AWA non-compliance.

Because Rise is now being deprived of this critical information as a result of the agency's unlawful Partial Inspection Policy, it must instead pursue alternative, more time-consuming and resource-intensive measures to obtain the information it needs to maintain ARLO and effectively prioritize its work. For example, Rise must now submit more Freedom of Information Act ("FOIA") requests, as well as requests under state open records laws, to obtain information about how the animals are being treated at AAALAC-accredited research facilities and whether the USDA is complying with its statutory obligation to ensure that these facilities are operating in compliance with applicable AWA standards. But even exhaustive records requests—*e.g.*, for complaints lodged against facilities or requests by facilities for permission to use certain procedures or deviate from regulations—cannot replace full inspection reports if inspectors only perform partial inspections.

In pursuit of these activities, ALDF regularly relies on inspection reports generated as a result of the inspections of research facilities that APHIS is required to conduct pursuant to the AWA to review, monitor, assess, and inform the public about conditions at research facilities and whether the USDA is performing its statutory duties to ensure that these facilities are treating animals humanely and in compliance with all applicable standards. These inspection reports typically include information about whether a particular facility is operating in compliance, or non-compliance, with relevant AWA standards, as well as what is being done to correct any deficiencies. ALDF also relies on APHIS inspection reports to educate its members about these matters and to prioritize its advocacy efforts by focusing on those facilities that are in chronic violation of the AWA.

Under the Partial Inspection Policy, the USDA prohibits inspectors from conducting full inspections of any AAALAC-accredited facility each year. Thus, the USDA inspection reports no longer contain information that is critical to ALDF's work.

Without this information, ALDF is forced to pursue other time-consuming strategies to obtain information to which they are legally entitled, including submitting FOIA requests to the USDA, pursuing state public records requests for information pertaining to research facilities, and soliciting information from others about animal mistreatment and neglect at specific facilities. Still, even exhaustive records requests and independent investigations cannot replace the

> information provided in full inspection reports. Having to seek and obtain information from other sources consumes significantly more staff time and resources than would be required if this information were publicly available in the inspection reports that the agency is required to publicly disclose and that would contain this information but for the USDA's unlawful Partial Inspection Policy. These resources have to be diverted from other activities and projects that ALDF would otherwise pursue to further the protection of animals.

(ECF No. 1 ¶¶ 8-10, 13-15.)   Because Plaintiffs' theory of informational injury is essential to its alleged organizational injury, it, too, fails to confer standing – which is to say, because Plaintiffs' organizational injury is dependent on its informational injury, Plaintiffs fail to state a concrete injury under either theory.   *See Lawyers' Comm. for 9/11 Inquiry, Inc. v. Wray, supra.*

Plaintiffs' theory of standing also fails at the redressability prong.   "It must be likely, as opposed to merely speculative, that a favorable decision will provide redress"  *Lawyers' Comm. for 9/11 Inquiry, Inc.*, 424 F. Supp. 3d at 34 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).   "And courts do not lightly speculate on how 'independent actors' not before them might exercise their broad discretion."  *Id.* (citing *Lujan*, 504 U.S. at 562).

Plaintiffs contend that the relief requested would redress their injuries because the Agency would be required to conduct full annual inspections of research facilities.   (Pl.'s Mot., Declaration of Kendra Melrose, Exhibit I, ECF No. 25-10 ¶ 14; Pl.'s Mot., Declaration of Ed Butler, Exhibit H, ECF No. 25-9 ¶ 13.)   Plaintiffs allege that if they prevail in this action, the Agency "will be required to conduct full annual inspections of all research facilities as required by the AWA, which in turn will provide Rise with crucial information about whether these facilities are operating in compliance with all applicable AWA standards."  (ECF No. 1 ¶ 11.)

Initially, it is unclear what meaning Plaintiffs attach to the phrase "full annual inspection." The AWA requires the Secretary to "inspect" research facilities at least once a year, 7 U.S.C. § 2146(a), and requires APHIS to make publicly available all "final [AWA] inspection reports."  §

2146a.  The statute does not define "inspection" (and the phrase "full annual inspection" does not appear as best the court can tell).  Further, Plaintiffs fail to identify any final inspection report that, in their view, fails to comply with the AWA.  That notwithstanding, it does not necessarily follow that an award of Plaintiffs' requested relief—setting aside the Partial Inspection Policy and declaring it unlawful—will redress Plaintiffs' asserted injury (*i.e.*, the absence of information).

Plaintiffs do not seek the court to order Defendants to conduct "full annual inspections" of the research facilities.  Rather, Plaintiffs request the court to set aside the Partial Inspection Policy in hopes that the Agency will conduct what Plaintiffs refer to as "full annual inspections," which, in turn, Plaintiffs hope will produce "crucial information about whether these facilities are operating in compliance with all applicable AWA standards."  (ECF No. 1 ¶ 11.)  *See Lawyers' Committee for 9/11 Inquiry*, 424 F. Supp. 3d at 34-35 (noting that the plaintiff's theory of standing fails at the redressability prong where the plaintiff's request that the court "order the FBI to report on seven categories of evidence, and they hope that this report would trigger the prosecution of one or more terrorists").

In sum, the court concludes that Plaintiffs lack standing.  While this alone warrants dismissal of the Complaint, the court will address Defendants' remaining arguments on subject matter jurisdiction.

### B.    Final Agency Action

Judicial review under the APA is limited to "final agency action."  5 U.S.C. § 704. "Agency action" is defined to "include[ ] the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act[.]"  5 U.S.C. § 551(13).  "Final agency action is a term of art that does not include all [agency] conduct such as, for example, constructing a building, operating a program, or performing a contract, but instead refers to an

agency's [final] determination of rights and obligations whether by rule, order, license, sanction, relief, or similar action." *Nat'l Veterans Legal Servs. Program v. United States Dep't of Def.*, 990 F.3d 834, 839 (4th Cir. 2021) (citation omitted). "The term action as used in the APA is a term of art that does not include all conduct on the part of the government." *City of New York v. United States Dep't of Def.*, 913 F.3d 423, 430 (4th Cir. 2019).

Defendants contend that judicial review is unavailable under the APA because the Partial Inspection Policy is not a final agency action. (ECF No. 35-1 at 10.) Specifically, Defendants argue that the Partial Inspection Policy "creates no legal consequences for any private party and therefore is not reviewable." *Id.*

The court finds guidance from *City of New York v. United States Dep't of Def.,* 913 F.3d 423 (4th Cir. 2019). There, the Fourth Circuit reviewed whether the district court properly granted the defendants' motion to dismiss for lack of jurisdiction under the APA because the plaintiffs did not allege a discrete agency action. *Id.* at 430. The court explained that judicial review under the APA is limited to "final agency actions":

> This definition limits the scope of judicial review in two important respects. First, each of the terms that comprise the definition of "agency action" is limited to those acts that are "circumscribed" and "discrete." *Norton v. Southern Utah Wilderness Alliance (SUWA)*, 542 U.S. 55, 62, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004). When challenging agency action—whether it be a particular action or a failure to act altogether—the plaintiff must therefore identify specific and discrete governmental conduct, rather than launch a "broad programmatic attack" on the government's operations. *Id.* at 64, 124 S.Ct. 2373. This distinction between discrete acts, which are reviewable, and programmatic challenges, which are not, is vital to the APA's conception of the separation of powers. Courts are well-suited to reviewing specific agency decisions, such as rulemakings, orders, or denials. We are woefully ill-suited, however, to adjudicate generalized grievances asking us to improve an agency's performance or operations. In such a case, courts would be forced either to enter a disfavored "obey the law" injunction, *see Int'l Longshoremen's Ass'n, Local 1291 v. Phil. Mar. Trade Ass'n*, 389

23

U.S. 64, 76, 88 S.Ct. 201, 19 L.Ed.2d 236 (1967), or to engage in day-to-day oversight of the executive's administrative practices. Both alternatives are foreclosed by the APA, and rightly so. The Supreme Court's guidance on this point is worth considering in full:

> If courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was achieved-which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management.

*SUWA*, 542 U.S. at 66-67, 124 S.Ct. 2373. The requirement that the challenger identify a discrete act keeps us from entering such a quagmire.

Second, the definition of "agency action" is limited to those governmental acts that "determin[e] rights and obligations." *Clear Sky Car Wash LLC v. City of Chesapeake, Va.*, 743 F.3d 438, 445 (4th Cir. 2014). This limitation ensures that judicial review does not reach into the internal workings of the government, and is instead properly directed at the effect that agency conduct has on private parties. To meet this requirement, a party must demonstrate that the challenged act had "an immediate and practical impact," *see Golden & Zimmerman LLC v. Domenech*, 599 F.3d 426, 433 (4th Cir. 2010), or "alter[ed] the legal regime" in which it operates. *See Bennett v. Spear*, 520 U.S. 154, 178, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). It is not enough for plaintiffs to simply identify a governmental action that ultimately affected them through the "independent responses and choices of third parties," or mere "coercive pressures." *Flue-Cured Tobacco*, 313 F.3d at 859, 861. This requirement applies fully to claims that an agency has failed to act, which is "properly understood as a failure to take an agency action." *See Norton*, 542 U.S. at 62, 124 S.Ct. 2373. Since "agency actions" must determine rights and obligations, claims to compel an agency to take an action must seek such a determination as well.

913 F.3d 423, 431-32 (4th Cir. 2019).

In concluding that the plaintiffs failed to establish subject matter jurisdiction under the APA because they did not challenge a discrete agency action and failed to demonstrate that the

defendant's reporting requirements in any way determined their rights and obligations, the *City of New York* court reasoned:

> First, the municipal appellants' claim does not challenge a discrete agency action. Instead appellants ask that we "supervise an agency's compliance with [the] broad statutory mandate" of the NIAA. *Murray Energy Corp. v. EPA*, 861 F.3d 529, 537 n. 4 (4th Cir. 2017). By appellants' own account, the DOD's failure to provide disqualifying conviction records for former service members is widespread and systemic. The department has admitted as much and is engaged in extensive efforts to increase its compliance. As all parties seem to agree, the road ahead is an arduous one, as DOD attempts to improve on its partial and inconsistent reporting. This is the sort of public policy problem that often requires reallocating resources, developing new administrative systems, and working closely with partners across government. Solving it will likely require expertise in information technology and deep knowledge of how military needs intersect with data collection. In other words, it is exactly the sort of "broad programmatic" undertaking for which the APA has foreclosed judicial review. *See SUWA*, 542 U.S. at 64, 124 S.Ct. 2373.
>
> …
>
> Moreover, the municipal appellants have failed to demonstrate that the DOD's reporting requirements in any way determine their rights and obligations. Accordingly, they have not identified an act that can be compelled by this court under § 706(1). *See SUWA*, 542 U.S. at 62, 124 S.Ct. 2373 (finding that a failure to act under § 706(1) means "failure to take an agency action"). The action challenged in this case is DOD's obligation to provide information only to another agency of the federal government: The Department of Justice. *See* 34 U.S.C. § 40901(e)(1)(C). The regulation permitting local law enforcement agencies to use the NICS refers only to access to the system, not to the particular information provided to the FBI by other federal agencies. The transfer of information between agencies does not, without more, alter the rights and obligations of any party. That is especially true, as here, where outside access to the information is entirely permissive and implicates none of the complaining party's obligations under federal law.

*Id.* at 432-34.

Defendants here contend that the Partial Inspection Policy is not a final agency action because it "does not in any way alter the obligations of regulated entities to comply with the requirements of the [AWA] and its implementing regulations" and it "does not alter any rights or obligations belonging to third parties, including the Plaintiffs." (ECF No. 35-1 at 10-11.) In response, Plaintiffs argue that the Partial Inspection Policy "altered the legal regime by denying the animals covered by the AWA the full protections of the statute" and denying Plaintiffs the ability to protect the animals. (ECF No. 39 at 15.) The court agrees with Defendants.

As the court stated in *City of New York*, "[i]nformational harms may involve novel facts, but they do not disrupt the legal principles set forth in the APA." 913 F.3d at 432 (citing *Golden & Zimmerman, LLC*, 599 F.3d at 431-32 (finding that an agency's "reference guide" was not agency action because it did not "impose new legal requirements")). Plaintiffs do not challenge specific and discrete Agency action or decision-making; rather, Plaintiffs take issue with the way in which the Agency conducts inspections in compliance with a statutory mandate. *See City of New York*, 913 F.3d at 433 (noting that the plaintiffs do not challenge a discrete agency action where they ask that the court 'supervise an agency's compliance with [the] broad statutory mandate' of the [National Instant Criminal Background Check System Improvement Amendments Act of 2007]") (quoting *Murray Energy Corp. v. EPA*, 861 F.3d 529, 537 n.4 (4th Cir. 2017)). While Plaintiffs refer often to the Partial Inspection Policy, at the heart of their Complaint is a request for judicial relief "to improve an agency's performance or operations." *See City of New York, supra.* It is not for this court to "engage in day-to-day oversight" of the Agency's practices and monitor the Agency's internal guidance directed to inspectors on how to conduct inspections of research facilities.

Moreover, Plaintiffs fail to demonstrate that the Partial Inspection Policy determines their rights and obligations.  The Partial Inspection Policy provides guidance to inspectors on how to conduct inspections at research facilities; it does not alter the rights or obligations of any party. *See City of New York*, 913 F.3d at 434-35 (concluding that the plaintiff fails to demonstrate that the defendant's "reporting requirements in any way determine their rights and obligations" "where the plaintiff seeks wholesale compliance with an entire administrative scheme, based solely on the fact that the government has granted them access to an information system").  Plaintiffs ask the court to extend judicial review beyond its permissible scope.

### C.    Discretion

Defendants also contend that judicial review is foreclosed because the way in which the Agency conducts inspections is committed to agency discretion.  (ECF No. 35-1 at 6.) Specifically, while the Secretary shall inspect each research facility once a year, how to conduct inspections and implementation of inspection regulations is squarely within the Agency's discretion.  7 U.S.C. § 2146(a).  In response, Plaintiffs maintain they "are challenging the agency's wholesale abandonment of its statutory duties."  (ECF No. 39 at 13.)  "Although there is a 'strong presumption' in favor of judicial review of agency action," *Speed Mining, Inc. v. Fed. Mine Safety & Health Review Comm'n*, 528 F.3d 310, 316 (4th Cir. 2008) (quoting *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986)), the APA bars judicial review of agency action 'committed to agency discretion by law.'"  *Casa De Maryland v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684 (4th Cir. 2019) (quoting 5 U.S.C. § 701(a)(2)).  "[J]udicial review is unavailable if a statute provides 'no judicially manageable standards . . . for judging how and when an agency should exercise its discretion.'"  *Speed Mining, Inc. v. Fed. Mine Safety & Health Rev. Comm'n*, 528 F.3d 310, 317 (4th Cir. 2008) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)).  For

example, an "agency's discretionary decision not to enforce the substantive law [is] unreviewable under the APA." *Casa De Maryland v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 698 (4th Cir. 2019) (citing *Heckler*, 470 U.S. at 828). Generally, "such decisions 'often involve[ ] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise,' including 'whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, [and] whether the particular enforcement action . . . best fits the agency's overall policies.'" *Id.* (quoting *Heckler*, 470 U.S. at 831).

In *Casa De Maryland v. U.S. Dep't of Homeland Sec.*, the Fourth Circuit held that the plaintiffs' claims were reviewable where the plaintiff challenged the department's decision to rescind DACA. 924 F.3d 684, 698-99 (4th Cir. 2019). The Fourth Circuit reasoned:

> Major agency policy decisions are "quite different from day-to-day agency []enforcement decisions." *Nat'l Treasury Emps. Union v. Horner*, 854 F.2d 490, 496 (D.C. Cir. 1988). Where an agency expresses a broad or general enforcement policy, different considerations than those driving *Chaney*'s presumption are at play. "As general statements, they are more likely to be direct interpretations of the commands of the substantive statute rather than the sort of mingled assessments of fact, policy, and law that drive an individual enforcement decision and that are, as *Chaney* recognizes, peculiarly within the agency's expertise and discretion." *Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 677 (D.C. Cir. 1994).

> Accordingly, as courts have recognized, an agency's expression of a broad or general enforcement policy based on the agency's legal interpretation is subject to review. *OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808, 811-12 (D.C. Cir. 1998) (holding courts had jurisdiction under APA because challenged agency action was a general policy of refusing to enforce provision of substantive law and not a "single-shot non-enforcement decision" (citing *Crowley*, 37 F.3d at 674-76)); *see Kenney*, 96 F.3d at 1123-24 (concluding *Chaney* applies to "individual, case-by-base determinations of when to enforce existing [law] rather than permanent policies or standards" and did not encompass agency's adoption of general policies stating standards agency deemed acceptable to implement statutory goals); *Crowley*, 37 F.3d at 672-73, 675 (*Chaney*'s

> presumption applies if "agency bases its refusal to enforce in an
> individual case solely on a legal interpretation without explicitly
> relying on its enforcement discretion"); *see also Edison Elec. Inst.
> v. EPA*, 996 F.2d 326, 333 (D.C. Cir. 1993) (holding challenge to
> agency's interpretation of law and regulations advanced in
> enforcement policy statement was "not the type of discretionary
> judgment concerning the allocation of enforcement resources that
> [*Chaney*] shields from judicial review"); *Nat'l Wildlife Fed'n v.
> EPA*, 980 F.2d 765, 767, 773 (D.C. Cir. 1992) (holding *Chaney*'s
> presumption "is inapplicable or at least rebutted [where plaintiff]
> raise[d] a facial challenge to the [agency's] statutory interpretation
> embodied in [a regulation] and d[id] not contest a particular
> enforcement decision" and citing authority in support). DACA's
> rescission fits well within this rubric.

*Casa*, 924 F.3d 684, 699 (4th Cir. 2019).

In the instant case, while the Agency's decision whether to conduct an investigation or inspection to determine whether a research facility has violated the AWA lies within the Agency's discretion, Plaintiffs here cite to the Partial Inspection Policy.  In view of the state of the record before the court, it is unclear to the court whether the Partial Inspection Policy falls within the guarded ambit of "discretionary decision" or whether it is more properly characterized as a broad enforcement policy.  *See People for the Ethical Treatment of Animals, Inc. v. United States Dep't of Agric.*, 7 F. Supp. 3d 1, 13 (D.D.C. 2013), *aff'd on other grounds sub nom. People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087 (D.C. Cir. 2015) (noting that to challenge a "general enforcement policy," the plaintiff must "cite to some kind of official, concrete statement of the agency's general enforcement policy").  Accordingly, the court declines to dismiss the Complaint on this basis.

Because the court finds it lacks subject matter jurisdiction, the court declines to address the parties' remaining arguments.

V.  **CONCLUSION**

For the reasons set forth herein, by separate accompanying order, the court grants Defendants' Motion to Dismiss at ECF No. 35 and denies as moot Plaintiffs' Motion for Summary Judgment at ECF No. 25 and Defendants' Motion for Summary Judgment at ECF No. 35.

/S/

_____

Julie R. Rubin
United States District Judge

March 21, 2024